## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELSEVIER, INC., et al.        :

          :

          **Plaintiffs**       :

      **v.**           :

          :

COMPREHENSIVE MICROFILM     :

& SCANNING SERVICES, INC. et al.   :

          :

          **Defendants**      :     3:10-cv-2513

      **v.**           :     (JUDGE MARIANI)

          :

PRINCETON MICRO SCAN CORP.,    :

FRANKLIN CRAWFORD, ANTHONY   :

DESTEPHEN, and JOHN DOE NOS. 1-10:

          :

       **Third-Party Defendants**   :

## MEMORANDUM OPINION

The present dispute is before the Court upon the Motions for Summary Judgment of

Plaintiffs, Defendants, and Third Party Defendants. For the reasons set forth below, each of

the motions will be denied.

## BACKGROUND[1]

Plaintiffs Elsevier Inc., Elsevier Science Inc., Elsevier B.V., Elsevier Science B.V.,

Elsevier Ltd., Mosby, Inc., John Wiley & Sons, Inc., John Wiley & Sons, Ltd., Wiley

---

[1] This section is written in narrative form as a result of the inability of the Court to discern even substantial agreement among the parties with regard to undisputed issues of material fact. The state of the record in this case shows that, almost without exception, there is a dispute of material fact as to Plaintiffs' claims, Defendants' defenses, and Third Party Defendants' defenses as well. "Whether a party is seeking summary judgment or opposing it, Rule 56(c)(1) requires the party to support its position by either: (1) citing to appropriate evidentiary materials in the record; or (2) showing how the materials cited by the opposing party do not establish the absence or presence of a genuine dispute of fact." *Moore's Federal Rules Pamphlet* § 56.4[3][c] (2013). Findings of fact are unnecessary at the summary judgment stage. *See id.* at § 56.8[2][b].

Periodicals, Inc., Wiley-Liss, Inc., Blackwell Publishing, Ltd., and American Chemical Society (collectively, "Plaintiffs") filed an original Complaint in this matter on December 10, 2010, alleging violations of the Copyright Act, 17 U.S.C. § 501, the Lanham Act, 15 U.S.C. § 1114(a) and 15 U.S.C. § 1117. (See Defs.' SMF at ¶ 1, ECF Dkt. 89-2; Pls.' Ans. to SMF at ¶ 1, ECF Dkt. 102.) Plaintiffs then filed an Amended Complaint, which included the original federal claims in addition to a supplemental common law claim for unfair competition. (See Defs.' SMF at ¶ 2; Pls.' Ans. to SMF at ¶ 2.) On May 17, 2011, Defendants Comprehensive Microfilm & Scanning Services, Inc. ("Comprehensive") and James A. Wasilewski ("Wasilewski")(together, "Defendants" or the "Comprehensive Parties") were granted permission to add Third-Party Defendants, specifically Princeton Micro Scan Corporation, Franklin Crawford and Anthony DeStephen (collectively, "Third Party Defendants" or the "Princeton Parties"). (See Defs.' SMF at ¶ 3; Pls.' Ans. to SMF at ¶ 3.)

### The Initial Action

This matter concerns the illicit reproduction of printed materials allegedly subject to copyright and trademark restrictions. Plaintiffs alleged that Defendants violated Plaintiffs' copyright and trademark rights when Defendants copied unprocessed microfilm with images of hard-bound journals for the Princeton Parties, so that the Princeton Parties could profit from the sale of the original printed materials to various buyers.

Franklin Crawford ("Crawford") was president of Princeton Micro Scan Corporation ("Princeon Micro Scan") and Anthony DeStephen ("DeStephen") was an employee. (See

2

Defs.' SMF at ¶¶ 7-8; Pls.' Ans. to SMF at ¶¶ 7-8.) DeStephen served as an employee from the 1970s until 2001, when he began to work for Princeton Micro Scan as a contractor for the corporation until 2010. (See Defs.' SMF at ¶ 8; Pls' Ans. to SMF at ¶ 8.) From 2001 until 2010, DeStephen continued to perform services for Princeton Micro Scan, although his exact status as a partner or contractor is unclear from the record, and constitutes a matter of dispute. (See Defs.' SMF at ¶ 8; Pls.' Ans. to SMF at ¶¶ 7-8.)

It is acknowledged by Plaintiffs and Defendants that DeStephen admitted to "engaging in acts of copyright infringement, including a scheme of making deals with hundreds of libraries to provide the library with a microfilm version of a journal in exchange for the paper journal, wherein he would take apart the binding of the paper journal, photograph each page at Princeton Micro Scan with the Princeton resources, send film for processing and then sell the paper journals to Educo Periodicals and Periodical Service Company." (See Defs.' SMF at ¶ 9; Pls.' Ans. to SMF at ¶ 9.)

DeStephen testified that he was only paid for hard copies of the journals and only made "one microfilm copy for each hard copy journal that he obtained from the various libraries" with which he conducted business. (See Defs.' SMF at 10.) Plaintiffs, however, argue that DeStephen was personally compensated for the sale of the print journals (see Pls.' Ans. to SMF at ¶ 10), and that Princeton Micro Scan would make a master copy of a journal for future use (see Pls.' Ans. to SMF at ¶ 10). Defendants assert that "[i]n exchange for the hard copy of a journal, [the Princeton Parties] would take the one set of Microfilm

copies produced and return it to the library that provided the paper journal." (See Defs.' SMF at ¶ 11.) Defendants further assert that "[t]he libraries were the original owners of the paper journals." (See Defs.' SMF at ¶ 11.)

Plaintiffs assert that Defendants received unprocessed microfilm from the Princeton Parties, and made copies at their request. (See Pls.' Ans. to SMF at ¶ 11.) Plaintiffs and Defendants dispute the number of copies made of each journal, although the parties do not dispute that where more than one copy was made it was not distributed to the public, but was retained by Princeton Micro Scan for future duplication. (See Defendants SMF at ¶¶ 11-12; Pls.' Ans. to SMF at ¶¶ 11-12). Defendants assert that they "worked entirely under the supervision, direction and control of Princeton Micro Scan Corporation in regards to processing microfilm for Princeton." (See Defs.' SMF at ¶ 19.) This is disputed by Plaintiffs. (See Pls.' Ans. to SMF at ¶ 19.)

Plaintiffs and Defendants agree that Princeton Micro Scan "controlled what microfilm would be processed by Defendants and all film was sent directly from Princeton to Defendants after original microfilm was created at Princeton [Micro Scan]." (See Defs.' SMF at ¶ 19(i); Pls.' Ans. to SMF at ¶ 19(i).) They further agree that "Defendants did not keep anything from the transaction, [and] returned all original film and microfilm produced directly to Princeton Micro Scan Corporation." (See Defs.' SMF at ¶ 19(ii); Pls.' Ans. to SMF at ¶ 19(ii).)

4

Defendants assert that they were unaware of the contents of the microfilm provided to them by the Third Party Defendants, and that they did not know that the reproduction of the unprocessed microfilms constituted possible illicit activity because they were unaware of the presence of any trademarks or copyright protections. (See Defs.' SMF at ¶ 35.) Specifically, Defendants assert that they were never provided with "documentation or titles identifying the material that Princeton sent to Defendants for processing or microfilm" (see Defs.' SMF at ¶ 24), and that the "film materials were unidentifiable and had no accompanying identifying documentation as to the source" (see Defs.' SMF at ¶ 31). Defendants assert that DeStephen concealed the fact that the microfilms he provided to them contained copyrighted material and registered trademarks. (See Defs.' SMF at ¶ 31.)

Plaintiffs argue, however, that Defendants had the ability to know the contents of the microfilm. (See Pls.' Ans. to SMF at ¶ 35.) Plaintiffs assert that "DeStephen did not conceal the contents of the microfilm from Defendants." (See Pls.' Ans. to SMF at ¶ 29.) The parties dispute whether Defendants generally perform quality checks on the materials they are reproducing, and whether such checks would involve an inspection of the content of the materials. (See Pls.' Ans. to SMF at ¶¶ 34-35.) Plaintiffs and Defendants both agree, however, that DeStephen was aware that he was sending copyrighted materials to Defendants, although it is unclear as to whether any other person at Princeton Micro Scan was similarly aware. (See Defs.' SMF at ¶ 30; Pls. Ans. to SMF at ¶ 30.) Defendants maintain that they had no information that would indicate that the materials were subject to

5

copyright or trademark restrictions (see Defs.' SMF at ¶ 35), but Plaintiffs argue that the materials contained copyright and trademark notices (see Pls.' Ans. to SMF at ¶ 35).

Plaintiffs and Defendants agree that DeStephen "admitted to knowingly engaging in direct acts of copyright and trademark infringement, entered into a settlement agreement with the Plaintiffs on April 16, 2010, wherein he agreed to pay publishers $100.00, and to completely cooperate with the publishers in providing information in relation to the prosecution of the issues or claims related to the case filed against him, however, the publishers retained their rights to refile claims against Mr. DeStephen if he materially breaches his obligations to cooperate with publishers." (See Defs.' SMF at ¶ 36; Pls.' Ans. to SMF at ¶ 36.)

It is admitted by both Plaintiffs and Defendants that on November 1, 2010, Plaintiffs entered into a Release Agreement ("Release Agreement") with Princeton Micro Scan Corporation and Robert S. Chaykowsky, the executor of the Estate of Franklin Crawford, in which a release was executed in exchange for a guaranteed minimum of $1,000,000.00 resulting from the sale of a commercial building owned by the Princeton Parties. (See Defs.' SMF at ¶ 39; Pls. Ans. to SMF at ¶ 39.)

The terms and scope of the Release Agreement are the subject of disagreement between Plaintiffs and Defendants. The parties agree, however, that "Plaintiffs entered into this agreement prior to initiating" the present litigation. (See Defs.' SMF at ¶ 41; Pls.' Ans. to SMF at ¶ 41.) They further agree that "[a]t the time of the Release Agreement's

6

execution, Plaintiffs had obtained the affidavit and declaration of Anthony DeStephen and were aware of Defendants actions as a third party." (See Defs.' SMF at ¶ 41; Pls.' Ans. to SMF at ¶ 41.) "Plaintiffs agreed to the provisions and signed off on the release while represented by counsel." (See Defs.' SMF at ¶ 41; Pls.' Ans. to SMF at ¶ 41.) "There was no evidence of fraud or mistake in the agreement and the agreement led to a dismissal of claims pending in the litigation for which it was created." (See Defs.' SMF at ¶ 41; Pls.' Ans. to SMF at ¶ 41.) Critically, the parties disagree, though, as to whether Defendants are protected by the Release Agreement. (See Defs.' SMF at ¶ 42; Pls.' Ans. to SMF at ¶ 42.)

### The Third Party Action

The Princeton Parties assert that beginning in 2004, "DeStephen began sending microfilm to Comprehensive . . . and James Wasilewski to be processed and duplicated." (See Third-Party Defs.' SMF at ¶ 1, ECF Dkt. 94 (hereinafter "Princeton's SMF").) The identity of the exact parties engaged in the packing of the materials is subject to dispute. (See Third-Party Pls.' Ans. to Third-Party Defs.' SMF at ¶ 2, ECF Dkt. 113 (hereinafter, "Ans. to Princeton's SMF".) The Comprehensive and Princeton Parties agree that Wasilewski received personal checks from DeStephen for his services, and that records were kept on ledgers that have since been discarded. (See Princeton's SMF at ¶¶ 3-9; Ans. to Princeton's SMF at ¶¶ 3-9.)

It is agreed between the Comprehensive and Princeton Parties that Wasilewski's contact person was DeStephen (see Princeton's SMF at ¶10), but they disagree as to

whether DeStephen was acting in "concert" with the other Third Party Defendants. (See Ans. to Princeton's SMF at ¶ 10). The Princeton Parties assert that "DeStephen never misrepresented the content of the film he sent to Wasilewski to duplicate" (see Princeton's SMF at ¶ 11); however, this is denied by the Comprehensive Parties (see Ans. to Princeton's SMF at ¶ 11.)

Both the Comprehensive and Princeton Parties agree that in 2004, at the commencement of their business relationship, Wasilewski asked DeStephen "if copying the materials from libraries was illegal." (See Princeton's SMF at ¶ 12; Ans. to Princeton's SMF at ¶ 12.) Both the Comprehensive and the Princeton Parties concur that DeStephen told Wasilewski that "we've been doing it for years" (see Princeton's SMF at ¶ 13; Ans. to Princeton's SMF at ¶ 13), but they do not agree as to the meaning of that statement. The Princeton Parties contend that they never concealed the content of the microfilm (see Princeton's SMF at ¶ 14), but this is also denied by the Comprehensive Parties (see Ans. to Princeton's SMF at ¶ 14). The Princeton Parties maintain that Wasilewski "regularly examined the microfilm he created for his customers for quality control" (see Princeton's SMF at ¶ 15); however, the Comprehensive Parties assert that such inspections were only carried out if the customer paid an additional fee for such an inspection and Wasilewski "did the actual filming of the images" (see Ans. to Princeton's SMF at ¶ 15). The Comprehensive Parties also contend that "a quality control check does not include a review of the content of the images." (See Ans. to Princeton's SMF at ¶ 15.) The Comprehensive

8

Parties assert that "[t]he images are reduced to the size of a postage stamp, and there can be up to 50,000 images in a processing run and it is impossible to read these images with a naked eye based on size and content." (See Ans. to Princeton's SMF at ¶ 15.)

Although both the Comprehensive and Princeton Parties agree that "Wasilewski had the ability to examine the microfilm he copied for DeStephen" (see Princeton's SMF at ¶ 16), the Comprehensive Parties argue that the quality control did not include a content search nor did the Princeton Parties pay for such quality control checks (see Ans. to Princeton's SMF at ¶ 16).

## STANDARD

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving

9

party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## DISCUSSION

Plaintiffs and Defendants have filed cross-motions for summary judgment, and Third Party Defendants have filed an additional motion for summary judgment. Each motion is addressed individually.

### I.    Defendants' Motion for Summary Judgment (Doc. 89)

Defendants' Motion for Summary Judgment (Doc. 89) asks the Court to address the following questions: (1) whether the provisions of a Release Agreement entered into between Plaintiffs and the Princeton Parties extend to Defendants so as to insulate them from liability in this case; (2) whether Defendants' activities with regard to the reproduction of microfilm constitutes fair use under 17 U.S.C. § 108 of the Copyright Act, in that Defendants may qualify for exceptions typically afforded to libraries and archives; (3) whether Plaintiffs have provided any evidence in support of their argument that the reproductive actions of Defendants constitute "use in commerce" and create consumer "confusion" among trademarks, thus violating 15 U.S.C. §§ 1114 and 1117 of the Lanham Act; and (4) whether Plaintiffs state a claim for unfair competition under Pennsylvania law.

10

## A. Release and Covenant Not to Sue

Defendants argue that they are not subject to suit in this matter because all claims against them have been released as part of an earlier Release Agreement between Plaintiffs and the Princeton Parties (see Release Agreement, ECF Dkt. 114-1). In support of their argument, Defendants argue that "Plaintiffs willingly entered into a settlement agreement with the Third Party Defendants and the parties jointly created and agreed on a Release Agreement." (See Defs.' Br. in Supp. Mot. for Summ. J. at 3, ECF Dkt. 90.) Defendants further argue that the Plaintiffs in the present case agreed in their Release Agreement with Princeton Micro Scan "to settle all claims in the case for approximately one million dollars or the percentage of the sales proceeds of the actual building that Princeton Microscan operated from once a sale was finalized." (See Defs.' Br. in Supp. Mot. for Summ J. at 4.) Defendants insist that "[s]pecifically included in the Release Agreement was a provision that was jointly signed by the parties that acted to release future claims against the Defendants in this case." (See Defs.' Br. in Supp. Mot. for Summ. J. at 4.)

Defendants further argue that "in the Release [A]greement between Plaintiffs and Third Party [D]efendants was an agreement that Plaintiffs agree not to engage any third party in any proceedings for copyright infringement arising out of the actions of the Princeton parties . . . ." (See Defs.' Br. in Supp. Mot. for Summ J. at 4.)

On the other hand, Plaintiffs argue that Defendants' interpretation of the Release

Agreement is incorrect and that nothing within the four corners of the Release Agreement

prevents Plaintiffs from pursuing the present action.

The parties dispute several sections of the Release Agreement, both with regard to

their meaning and applicability. Paragraph 8 of the Release Agreement states, in pertinent

part, that Plaintiffs:

> [H]ereby release, remise, and forever discharge the Princeton Parties, Leslie
> Crawford, Mark Crawford[,] . . . Grant Crawford, and Robert S. Chaykowsky,
> their current and former employees, officers, directors and shareholders, as
> well as their heirs, predecessors, successors, assigns and all past, present,
> and future agents, accountants, attorneys, guardians and representatives
> ("Princeton Releasees") of and from all debts, obligations, reckonings,
> promises, covenants, agreements, contracts, controversies, suits, actions,
> causes of action, judgments, damages, claims or demands, in law or in
> equity, whether known or unknown, foreseen or unforeseen, asserted or
> unasserted, which the Publishing Releasors ever had, now have or herein
> can, shall, or may have against the Princeton Releasees from the beginning
> of the world until the date of this Release.

(See Release Agreement at ¶ 8, ECF Dkt. 111, Exh. 3.)

At the outset, the Court notes that Paragraph 8 is directed exclusively to Plaintiff's

release of "the Princeton Parties, Leslie Crawford, Mark Crawford[,] and Robert S.

Chaykowsky, their current and former employees, officers, directors and shareholders, as

well as their heirs, predecessors, successors, assigns and all past, present, and future

agents, accountants, attorneys, guardians and representatives . . . ." (See Release

Agreement at ¶ 8.) Importantly, the Court is unable to determine, and the parties dispute,

whether Defendants in the present action are or were "agents" of any of the released parties

12

named in the Release Agreement. The language of Paragraph 8 is insufficiently clear to

permit this Court to grant summary judgment. Trial in this matter is therefore necessary to

determine whether the Defendants, or either of them, was an "agent" of any of the released

parties identified in Paragraph 8. What is clear, however, is that Defendants were not

included by name in the language of the Release Agreement even though the present

litigation had already commenced at the time of its execution. (See Defs.' SMF at ¶ 41; Pls.'

Ans. to SMF at ¶ 41.)

Paragraph 9 of the Release Agreement is irrelevant to Defendants defenses. That

paragraph provides that:

> The Princeton Parties and all of their predecessors, successors, heirs,
> assigns, present, and future agents, accountants, guardians, representatives,
> employees, attorneys, trustees, independent contractors, and fiduciaries
> ("Princeton Releasors") hereby release, remise, and forever discharge the
> Publishers and all of their predecessors, successors, heirs, assigns, parents,
> holding companies, subsidiaries, affiliates, divisions, past, present, and future
> agents, accountants, guardians, representatives, employees, officers,
> directors, attorneys, shareholders, trustees, independent contractors, and
> fiduciaries ("Publishing Releasees") of and from all debts, obligations,
> reckonings, promises, covenants, agreements, contracts, controversies, suits,
> actions, causes of action, judgments, damages, claims or demands, in law or
> in equity, whether known or unknown, foreseen or unforeseen, asserted or
> unasserted, which the Princeton Releasors ever had, now have or hereinafter
> can, shall, or may have against the Publishing Releasees from the beginning
> of the world until the date of this Release.

(See Release Agreement at ¶ 9.)

The clear language of this provision does not in any way preclude Plaintiffs from

raising claims against Defendants. The language serves to prevent the Princeton Parties

13

from asserting claims against various persons or entities associated with Plaintiffs. It does not serve to prevent Plaintiffs from raising claims against any person or entity, and simply works to prevent the Princeton Parties from asserting claims against Plaintiffs and their associates.

Similarly, Paragraph 19 of the Release Agreement does not release Defendants.

That section provides:

Except as may be ordered by a court of competent jurisdiction, the Publishers covenant and agree not to assist or engage any third party in any investigation or proceeding regarding claims of copyright infringement arising out of the actions of the Princeton Parties, except as required by court order or subpoena as to which prompt notice will be provided to the Princeton Parties.

(See Release Agreement at ¶ 19.)

New York law requires that any release be made in clear, unequivocal language that demonstrates intent to release a party from liability. Bank of Amer. Nat. Trust & Savings Assoc. v. Gillaizeau, 766 F.2d 709, 713 (2d Cir. 1985)("New York law requires that a release contain an explicit, unequivocal statement of a present promise to release defendant from liability")). Similarly, Pennsylvania law requires that "the effect of a release must be determined from the ordinary meaning of its language." Hanselman v. Consolidated Rail Corp., 632 A.2d 607, 609 (Pa. Commw. Ct. 1993)(citing Wolbach v. Fay, 488 Pa. 239, 412 A.2d 487 (Pa. 1980)). In the present matter, the proper application of the terms of Paragraph 19 to Defendants demonstrates that Plaintiffs agreed not to "assist or engage" any third party with regard to prosecuting claims of copyright or trademark

14

infringement arising from the actions underlying the Release Agreement. Not only is it sufficiently clear to the Court that Paragraph 19 has narrow application, but it is clear that the Release does not relieve Defendants from liability in the "clear, unequivocal language" required under New York law or in the plain language required in Pennsylvania. Plaintiffs are not "engaging" or "assisting" any third party through their present actions, for it is the Plaintiff's themselves who are pursuing the immediate claims. We find the language clear and unequivocal in not presenting a release of the Defendants or a bar to a suit being brought against them by Plaintiffs. The express language of the Release Agreement demonstrates that the parties could not have intended to release Defendants or bar a suit against them where they used language to create an exception to the Plaintiffs' obligations which would be triggered by a Court order or the service of a subpoena. Nothing in the language of Paragraph 8, where specific parties who are to be released from liability are named, demonstrates that Defendants were intended to be included as named parties to the Release Agreement[2], and the language of Paragraph 19 does nothing to alter this interpretation.

Finally, Paragraph 15 of the Release Agreement contains the following language:

This Settlement Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, agents, guardians, representatives, predecessors, successors, assigns, parents, holding companies, subsidiaries, affiliates, divisions, employees, officers, directors, attorneys, shareholders, trustees, independent contractors, and fiduciaries.

---

[2] By the above statement, we do not contradict our earlier determination that whether the Defendants, or either of them, were "agents" of the named released parties remains an issue in dispute and for trial.

(*See* Release Agreement at ¶ 15.)

Paragraph 15's usage of the terms "agents" and "independent contractors" clearly refers only to the "independent contractors" identified in earlier provisions of the Release Agreement, including Paragraph 9. "Independent contractors" are not released in Paragraph 8, which is the applicable provision governing Plaintiffs' discharge of liability with regard to specifically named entities and persons. Thus, even if Defendants constituted "independent contractors," they would not be released because Paragraph 9, in which the "independent contractor" language is used, cannot be read in any way so as to constitute a release by Plaintiffs in favor of Defendants. Accordingly, Paragraph 15 does not apply to Defendants.

### B. Library Use Exception Under 17 U.S.C. § 108 of the Copyright Act

The essential rights owed to a copyright owner are detailed in 17 U.S.C. § 106. As noted by Plaintiffs, Section 106(1) provides a copyright owner with the exclusive right "to reproduce the copyrighted work in copies or phonorecords." *See* Pls.'s Br. in Opp. to Mot. for Summ. J. at 8, ECF Dkt. 103 (quoting 17 U.S.C. § 106(1)). As a defense to its reproduction activities, Defendants raise 17 U.S.C. § 108, which provides an exception for fair use duplications of copyrighted materials by "libraries and archives."

Section 108(a) provides a narrow exception to "a library or archives, or any of its employees acting within the scope of their employment, to reproduce no more than one copy or phonorecord of a work. . . ." *See* 17 U.S.C. § 108(a). "Libraries house copyrighted

16

books and journals in their collections, provide intellectual access to them through catalogs

and indexes, and make them available to users." Laura N. Gasaway, *Amending the*

*Copyright Act for Libraries and Society: The Section 108 Study Group*, 70 Alb. L. Rev. 1331,

1331 (2007). Under Section 108(a), the library exception only applies if:

(1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage;

(2) the collections of the library or archives are (i) open to the public, or (ii) available not only to researchers affiliated with the library or archives or within the institution of which it is a part, but also to other persons doing research in a specialized field . . . .

*See* 17 U.S.C. §108(a)(1)-(2).

The record indicates that there is disagreement as to whether Comprehensive or

Wasilewski can claim the library fair use exception because the nature of Defendants'

relationship to the "libraries" for which the microfilm was provided is a matter of dispute. In

addition, there is a factual dispute as to whether Wasilewski was an employee of a "library"

or an "archives," and as to whether he was acting within the scope of his employment with

such an institution. Both parties fail to provide any undisputed factual evidence to support

their arguments that Defendants may or may not take advantage of the protections afforded

under Section 108. Importantly, there is an additional factual dispute as to whether the

institutions that provided the original print journals would constitute "libraries" or "archives"

as the terms are defined by statute, as the record contains no evidence to substantiate the

parties' respective positions.

17

Further, Section 108 is only applicable if "(1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage." *See* 17 U.S.C. § 108(a)(1). In the present matter, Defendants admit that they charged money for the processing and reproduction of microfilm, and did so for several years. (*See* Defs.' SMF at ¶ 19(iii).) Given this admission, the record tends to indicate that Defendants engaged in the act of reproducing microfilm and did so for commercial profit.

Finally, the Court notes that Defendants admit that they often made more than one copy of a microfilm. (*See* Defs.' SMF at ¶ 12.) Thus, the one-to-one reproduction ratio touted by Defendants in support of their defense that their activity constituted an even swap is belied by their own admission that they made additional copies for future reproduction activities.

Because numerous issues of material fact as to whether Defendants can take advantage of the library fair use exception under Section 108 remain, the Court will not enter summary judgment.

## C. Whether Defendants' Activities Constitute "Use in Commerce" As Applied to 15 U.S.C. §§ 1114 and 1117 of the Lanham Act

Defendants argue that Plaintiffs have failed to state a claim under 15 U.S.C. §§ 1114 and 1117, because Plaintiffs have failed to produce any evidence demonstrating that the alleged acts by Defendants constitute "use in commerce" as defined by 15 U.S.C. § 1127 of the Lanham Act or that they created "consumer confusion."

18

Under 15 U.S.C. § 1114: "(1) Any person who shall, without the consent of the

registrant (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of

a registered mark in connection with the sale, offering for sale, distribution, or advertising of

any goods or services or in connection with which such use is likely to cause confusion, or

to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the

remedies hereinafter provided." See 15 U.S.C. § 1114. The Supreme Court has construed

Section 1114 to require a plaintiff to demonstrate that the defendant's actual conduct is

"likely to cause confusion, or to cause mistake, or to deceive" the public about the origin of

goods or services. See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S.

111, 111-112, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004). The Supreme Court further

explained that "a plaintiff claiming infringement of an incontestable mark must show

likelihood of consumer confusion as part of the prima facie case." See id. at 112.

Defendants contend that "[c]onsumer confusion is at the heart of trademark law."

See Defs.' Br. in Supp. Mot. for Summ. J. at 25, ECF Dkt. 90. They further contend that in

the present case, "Plaintiffs have failed to make a prima facie case for consumer confusion,

since the trademarks on microfilm were sent back to the original purchasers of the journals

bearing those marks." See id. Defendants argue that the "libraries were the ultimate

consumers of microfilm as well as the owners of the hard copy journals." See id. at 26.

Defendants also assert that the "[l]ibraries received one exact microfilm copy of a journal

they once owned in hard copy form and had no confusion as to the origin of the microfilm or

19

that the mark or marks were associated with any other company or entity, since they were aware that the one microfilm copy was provided in exchange for the one hard copy." *See* *id.*

Defendants' argument cannot succeed for several reasons. First, Defendants admit that they routinely produced more than one copy of each microfilm in the course of their processing activities—activities for which they were admittedly paid. Plaintiffs and Defendants admit that one copy was sent to the library while another was provided to the Third Party Defendants for their archives. Thus, the argument that a one-to-one reproduction of a journal containing registered marks was nothing more than an even swap is without merit. This further undermines the argument that the reproductions were not made for "use in commerce," which resulted in commercial gain by Defendants. Further, Defendants cannot merely assert that there is no confusion because they sent identical marks back to the original owners of the hard copies. Such a determination must be made at trial.

Defendants argue that because "the price of the microfilm goods were free for customers as an exchange rather than" as an actual purchase, Defendants could not have "adopted" or "used" the marks as if they were attempting to create market confusion. (*See* Defs.' Br. in Supp. Mot. for Summ. J. at 20.) Simply put, Defendants posit that they did not "use" or "adopt" the marks because they engaged in a one-to-one swap with the original hard-bound journals, and the original owners received the microfilm copies containing the

original marks thus eliminating any potential confusion. (*See* Defs.' Br. in Supp. Mot. for

Summ. J. at 24, ECF Dkt. 90.) A resolution of this argument, however, would require the

Court to engage in a factual analysis that must be reserved for a jury.

Federal courts in Pennsylvania have held in cases treating the use of identical marks

that there is a presumption of a likelihood of confusion. *See First Am. Mktg. Corp. v.*

*Canella*, 2004 WL 250537, at \*5 (E.D. Pa. Jan. 26, 2004)("Similarity between marks and the

goods marketed usually merits a presumption of a likelihood of confusion"); *Fisions*

*Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 482 (3d Cir. 1994)("One need only look

at the marks themselves to conclude that they are so similar that one can only wonder how

an ordinary customer of the goods could be anything but confused by the parties'

indistinguishable use of the FAIRWAY mark. The packaging of the products, the prominent

use of the word 'Fairway,' and the inclusion of a triangular flag rising from a tree centered on

a golfing green, are, for all intents and purposes, virtually identical as to both products.

Under *Ford Motor Co.* and *Opticians Association of America*, this similarity all but creates a

presumption of the requisite likelihood of confusion."); *Opticians Ass'n of Am. v. Indep.*

*Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)("Thus, likelihood of confusion is

inevitable, when, as in this case, the identical mark is used concurrently by unrelated

entities"); *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981)("We

perceive that there is a great likelihood of confusion when an infringer uses the exact

trademark . . . .").

In the present matter, however, there is an issue of fact as to whether the "marks" contained on the microfilm were "used" because Defendants deny that they knew that such marks existed at the time of reproduction. Further, Defendants assert that there could be no confusion because the reproduced microfilm contained the exact marks found on the hard bound journals and were returned to the libraries that provided the originals.

In the Third Circuit, the unauthorized use of a trademark will infringe the trademark holder's rights if the use is likely to confuse an "ordinary customer" with regard to source of the goods or services. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991)). In the present matter, the facts presented are particularly appropriate for a jury because the jury is in the most advantageous position to determine whether the "ordinary customer" would be confused by the use of the mark. Here, the jury should be given the ability to determine the likelihood of confusion based upon the marks, if any, as they are contained on both the original journals and the duplicated microfilm versions. The jury should also be permitted to evaluate whether the marks, if any, were visible to Defendants.

Defendants posit that they did not act willfully, and thus did not "use" or "adopt" the marks, and that they had no knowledge that they were reproducing material protected by federally registered trademarks. The Court on summary judgment does not resolve factual disputes concerning the willfulness of the parties. In particular, whether a conversation between Wasilewski and DeStephen, in which Wasilewski inquired as to whether the

reproduction of the microfilms might be illegal, confirms or vitiates Defendants' claims of lack of knowledge presents a dispute of material fact. DeStephen's answer that "we've been doing it for years" is sufficiently susceptible to more than one interpretation to create a further dispute of material fact. Likewise, whether Wasilewski drew any particular conclusion from that answer and whether such a conclusion should be believed are matters for trial. Given the factual disagreement on these material issues, the Court cannot make a determination as to whether Defendants engaged in trademark infringement, and if they did, whether their actions constitute innocent infringement under 15 U.S.C. § 1114(2)(A).[3]

Similarly, the Court will not decide issues of fact with regard to Wasilewski's billing practices or as to the destruction of Defendants' records relating to its dealings with the Princeton Parties.

Finally, 15 U.S.C. § 1117 provides for damages and costs for "violations of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title. . . ." See 15 U.S.C. § 1117.[4] As a result of the factual disputes set forth in the record with regard to the underlying substantive claims, including the willfulness of the parties, the Court will not enter summary judgment with regard to damages or injunctive relief as permitted under Section 1117.

---

[3] "Innocent infringers" under 15 U.S.C. § 1114(2)(A) are subject only to injunction.

[4] In addition to recovery of defendant's profits, monetary damages, and costs of the action, a person or entity who is found to be a trademark infringer is subject to treble damages for "intentional" use of a mark or designation. 15 U.S.C. § 1117(b).

23

### D. Unfair Competition Under Pennsylvania Law

Pennsylvania law defines unfair competition as the "passing off" of rivals' goods as one's own, which creates confusion as to the authenticity of the goods in question. *See M.D. v. Claudio*, 714 F. Supp. 2d 508, 521 (E.D. Pa. 2010)(citing *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 180 (3d Cir. 2003)); *see also Goebel Brewing Co. v. Esslingers, Inc.*, 95 A.2d 523, 526 (Pa. 1953)("underlying principle of law of unfair competition is to prevent substitution by deception"). Pennsylvania courts have also recognized unfair competition "where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *See Synthes (U.S.A.) v. Globus Med., Inc.*, No. 04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005)). "If the defendant's action produces confusion in the public mind, it constitutes unfair competition for which equity affords relief." *Goebel Brewing Co.*, 95 A.2d at 527.

Defendants argue that they "did not pass off any goods as the Plaintiffs" and that they are not "rivals" of Plaintiffs. *See* Defs.' Br. in Supp. Mot. for Summ. J. at 31. In order to grant summary judgment on the unfair competition claim, the Court would be required to make findings of fact similar to those required under the federal claims, including an evaluation of the presence of marks that may create consumer confusion and the willfulness

of the Defendants. On the facts presented, the Court will not strain to presume a likelihood of confusion, but will reserve the issue for trial.

## II. Plaintiffs' Motion for Summary Judgment (Doc. 95)

Plaintiffs' Motion for Summary Judgment (Doc. 95) asks the Court to determine: (1) that there are no factual disputes regarding the ownership of the copyrights (see Pls.' Br. in Supp. Mot. for Summ J. at 2-4, ECF Dkt. 96); (2) that there are no disputes that Defendants unlawfully infringed these copyrights (see Pls.' Br. in Supp. Mot. for Summ. J. at 4-7); (3) that Defendants' affirmative defenses fail as a matter of law (see Pls.' Br. in Supp. Mot for Summ. J. at 9); and (4) that at least minimum statutory damages should be awarded under 17 U.S.C. § 504(c) (see Pls.' Br. in Supp. Mot. for Summ J. at 22).

Earlier in this memorandum's treatment of Defendants' Motion for Summary Judgment, the Court detailed the numerous factual disputes that prevented the award of summary judgment. To find in Plaintiffs' favor on the present motion, the Court would be required to resolve identical facts to those it refused to address in Defendants' motion. Thus, for the same reasons as set forth above, the Court will decline to award summary judgment in favor of Plaintiffs. In addition, the Court notes that Plaintiffs' Brief in Support of its Motion for Summary Judgment makes no attempt to identify any facts that are undisputed in the record.

Although the parties do not dispute that Plaintiffs own the exclusive copyrights to the journals in question, there are substantial factual disputes with regard to the questions of alleged infringement and Defendants proffered defenses.

In particular, the Court may not engage in the resolution of disputed facts to determine the "use" or "adoption" of marks (*see, supra,* 17-19), the knowledge and willfulness of Defendants in engaging in alleged illegal activities (*see, supra,* 19-20), whether Defendants or the institutions for which microfilm copies were made may avail themselves of the fair use exception under Section 108 of the Copyright Act (*see, supra,* 15-16), and whether Defendants constitute "agents" under the terms of the Release Agreement (*see, supra,* 10-12). The very core of Plaintiffs' arguments requires findings of fact. Accordingly, the factual issues set forth in Plaintiffs' Motion for Summary Judgment with regard to both its claims and arguments in opposition to Defendants' affirmative defenses must be decided at trial.

III.    Third Party Defendants' Motion for Summary Judgment (Doc. 91)

Third Party Defendants Motion for Summary Judgment asks the Court to determine: (1) whether Wasilewski knew that he was making copies of copyrighted materials (Third Party Defs.' Br. in Supp. of Mot. for Summ. J. at 2, ECF Dkt. 92)(hereinafter, "Princeton's Brief"); (2) whether the Princeton Parties had a duty to disclose the copyrighted nature of the materials (*see* Princeton's Brief at 7); (3) whether the Princeton Parties misrepresented the contents of the microfilm (*see* Princeton's Brief at 8); and (4) whether the Princeton

26

Parties concealed the contents of the microfilm from Defendants (see Princeton's Brief at 10). Each of these questions requires an implicit requirement that the Court decide disputed issues of material fact; accordingly, the Court will refrain from granting the Princeton Parties' Motion for Summary Judgment, and will reserve the disputed issues for trial.

In particular, the Court will not engage in a factual analysis as to what Wasilewski knew with regard to the possible illegality of his actions, or whether anyone misrepresented or concealed the contents of the microfilm. Defendants insist that they did not know that the material was copyrighted, but Plaintiffs and the Princeton Parties assert otherwise. These are issues more appropriately decided by a jury than a Court at the summary judgment stage.

## CONCLUSION

For the reasons set forth in this memorandum opinion, Defendants' Motion for Summary Judgment, Plaintiffs' Motion for Summary Judgment, and Third-Party Defendants' Motion for Summary Judgment will be denied.

DATE: April 10, 2013

Robert D. Mariani
United States District Judge